IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

| IN THE MATTER OF THE SEARCH OF INFORMATION STORED ON SERVERS MAINTAINED BY AXXESS | Case No. ____7-23-mj-144____<br><br>**Filed Under Seal** |
| --- | --- |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Megan Effing, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to seize account information relating to 1ST ADULT N PEDIATRICS and its owners, operators and affiliated entities, that is stored at premises owned, maintained, controlled, or operated by Axxess, a cloud-based electronic health records provider located at 16000 Dallas Parkway, Suite 700N, Dallas, Texas, described in more detail below and in Attachment A. This Affidavit is made in support of an application under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Axxess to disclose to the government records and information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since September, 2020. As such, I am a federal law enforcement officer within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government

agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

3. I am assigned to the Richmond Division, Roanoke Resident Agency, currently working white collar crime and health care fraud investigations. By virtue of my training and experience as a special agent, I am familiar with investigations involving individuals who execute fraudulent schemes. I received initial training and instruction to become a Special Agent at the FBI Academy located in Quantico, Virginia, including training concerning violations of the United States criminal statutes. Further, I have experience and training in a variety of investigative and legal matters, including the topics of electronic evidence management and analysis, lawful arrests, the drafting of search warrant affidavits, and probable cause. While serving within my capacity at the FBI, I have authored search warrants concerning various federal criminal violations.

4. Based on the information detailed below, I submit that there is probable cause to believe that CAROLYN BRYANT-TAYLOR ("BRYANT-TAYLOR"), SAMUEL OKOCHA ("SAMUEL"), KAFOMDI "JOSEPHINE" OKOCHA ("JOSEPHINE"), and SHEKITA GORE ("GORE") a/k/a SHEKITA STEELE, doing business as 1ST ADULT N PEDIATRIC HEALTHCARE, National Provider Identifier (NPI) 1912356098; 1ST ADULT & PEDIATRIC HCS, INC., NPI 1992367841; 1ST ADULT & PEDIATRIC MEDICAL SUPPLY LLC, NPI: 1770025124 (collectively, "1ST ADULT"), willfully and knowingly conspired with each other and with others known and unknown to execute a scheme and artifice to defraud and to obtain, by means of false and fraudulent pretenses, representations, and promises, money owned by, and under the custody and control of, the

2

Medical Assistance Program ("Medicaid") in connection with the delivery of and payment for, health care benefits, items, and services in violation of Title 18, United States Code, Sections 1347 and 1349.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses, including interviews with Medicaid recipients and/or their caregivers. All observations that were not personally made by me were related to me by the person(s) who made such observations.

6. This affidavit contains information necessary to support probable cause for this application. The affidavit is not intended to include each and every fact and matter observed by me or known to the government.

7. A preservation letter was sent to Axxess on September 29, 2021.

8. On October 8, 2021, a health care fraud subpoena issued by the United States Attorney's Office for the Western District of Virginia was served on Axxess. As of this filing, Axxess has failed to respond to the subpoena.

## JURISDICTION

9. Under 18 U.S.C. § 2703(a), the Government "may require the disclosure by a provider of communication, that is in electronic storage in an electronic communications system . . . only pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction." *See also* 18 U.S.C. §§ 2703(b)(1)(A), (c)(1)(A). A "court of competent jurisdiction" to issue the type of warrant requested here includes "any district court of the United States (including a magistrate judge

of such a court) . . . that . . . has jurisdiction over the offense being investigated." 18 U.S.C. §
2711(3)(A)(i).

10. This Court is a court of competent jurisdiction under § 2703 because it has
jurisdiction over the offenses committed by 1ST ADULT and its owners, operators and
affiliated entities, which they committed in whole or in part in the Western District of
Virginia.

11. Finally, Axxess provides clients with an "electronic communication service" as that
term is defined by 18 U.S.C. § 2510(12), and/or a "remote computing service" as that term is
defined by 18 U.S.C. § 2711(2), in that Axxess provides 1ST ADULT with a platform to
store medical records. Axxess and the nature of the remote data storage and other services it
provides are further explained below.

12. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not
required for the service or execution of this warrant.

## BACKGROUND CONCERNING ELECTRONIC HEALTH RECORDS

13. An electronic health record (EHR) is a digital version of a patient's paper medical
chart, which includes, among other things, medical services and tests provided, the medical
provider rendering the services, and the billing information. Companies such as Axxess
provide healthcare providers access to EHR software. Pursuant to its website,
www.axxess.com, Axxess provides a cloud-based clinical and business management platform
which provides support for EHR, practice management, marketing, patient engagement, and
billing. The company supports physicians, physical assistants, nurse practitioners, therapists,
and office managers through the various platforms it provides.

14. I know from information obtained through multiple witness interviews conducted during the course of the investigation that 1ST ADULT uses Axxess to store EHR. 1ST ADULT patients and nurses have electronic access to Axxess. 1ST ADULT owners and operators, as well as nurses providing care, have their own unique log-in accounts which provide access to patient files on Axxess. Log-ins capture geographic location of the person signing on at the time of access. Nurses use Axxess to log hours worked for a particular patient and author notes related to the patient's care. Interviews conducted during this investigation reveal 1ST ADULT owners and operators are able to log into patient files stored on Axxess and manipulate patient files. As such, the computers/servers of Axxess are likely to contain stored EHR generated by 1ST ADULT. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to determine what services were rendered and who rendered the services.

15. In general, providers like Axxess ask each of their subscribers to provide certain personal identifying information when registering for an account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, e-mail addresses, and, for paying subscribers, a means and source of payment (including any credit or bank account number). Providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including

whether the account is inactive or closed), the methods used to connect to the account, and other files that reflect usage of the account.

16. In addition, providers often have records of the Internet Protocol address (IP address) used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the subscriber's account.

17. In some cases, account users will communicate directly with a provider about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users. Providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

18. There is probable cause to believe that Axxess provides the aforementioned services to 1ST ADULT.

## SCOPE OF THE RECORDS SOUGHT

19. There is probable cause to believe that the property to be searched (as identified in Attachments A and B) will contain evidence that 1ST ADULT engaged in violations of 18 U.S.C. § 1347 (Health Care Fraud), 18 U.S.C. § 1349 (Conspiracy to Commit Health Care Fraud), and 18 U.S.C. § 1512 (obstruction of justice). Such evidence is expected to include, but is not limited to, EHR of current and former patients of 1ST ADULT, which will show services rendered (or not rendered) by 1ST ADULT and lead to evidence of the crimes under investigation.

20. Based on information obtained during the course of this investigation, probable cause exists that 1ST ADULT has engaged in the offenses described above as regards the patients listed by name in Attachment B. As outlined in detail below, 1ST ADULT billed the Virginia Department of Medical Assistance Services (DMAS) for services not rendered to these patients. Additionally, BRYANT-TAYLOR and others, on behalf of 1ST ADULT, obstructed and attempted to obstruct justice in order to impede investigations into 1ST ADULT's illicit practices.

21. I know from my training and experience, and from consultation with other knowledgeable law enforcement agents, that a review of the requested subset of patient files is necessary to: (1) determine services rendered and hours logged by nurses and aides in connection with patient care; (2) identify patient file records and other documentation that may have been altered; and (3) identify potentially fraudulent claims submitted to DMAS.

## OVERVIEW OF MEDICAID PROGRAM

22. Medicaid is a health care benefit program as defined in Title 18, United States Code, Section 24(b), that provides medical assistance to low-income individuals who meet certain eligibility requirements. Funding for Medicaid comes from both the federal government and the Commonwealth of Virginia. In Virginia, the Medicaid program is administered and supervised by DMAS. DMAS is responsible for payment to medical service providers for care and services received by Medicaid-eligible individuals.

23. Medicaid has established procedures in accordance with federal regulations to compensate health care providers for services provided to Medicaid recipients. An organization can participate in the Medicaid program if it has a valid participation agreement

with Medicaid agreeing that it will: (1) provide the service, (2) submit an accurate claim, and (3) accept as payment in full the amount paid by Medicaid. Providers also agree to keep such records as are necessary to document the services provided to Medicaid recipients, and to furnish such information to Medicaid upon request; to render and perform services that are in accordance with federal and state law and applicable regulations; and to only submit to Medicaid claims that comply with Medicaid's rules and regulations.

24. Medicaid will only pay for services that are medically necessary and meet established rules and regulations. Providers are responsible for reading and adhering to the policies and regulations explained in the Medicaid provider manuals. Providers agree to only submit claims for services they actually provide to a Medicaid recipient.

*Home Health Agencies*

25. Home health agencies may provide private duty nursing, personal care, and respite care services, which are designed to prevent or reduce unnecessary institutional care.

26. Private duty nursing, i.e., skilled, in-home nursing care, is provided by a registered nurse (RN) or a licensed practical nurse (LPN) under the supervision of an RN. These services are rendered according to a plan of care, which enables the patient to remain at home rather than in a hospital or nursing facility.

27. Personal and respite care may be provided by aides who perform basic health-related services, to include assisting with personal hygiene, eating, walking, meal preparation, feeding, and taking and recording vital signs.

28. DMAS requires that aides record the personal and respite care services they

have provided, including arrival and departure times and any significant physical, social and emotional conditions of the recipient. Either the recipient or the recipient's caregiver must sign the records weekly, along with the provider. DMAS accepts the provider record as proof that services were rendered and reimburses providers for the amount of time that service was provided.

29. An RN must supervise aides who provide personal care. When only personal care services are being furnished, an RN must make a supervisory visit to the recipient's residence at least every 90 days when an aide is furnishing care.

30. When a recipient begins receiving private duty nursing services, an RN must perform an assessment, which must be maintained in the recipient's record throughout the duration of treatment. Nursing plans of care based on the initial admission assessment are required for all recipients and must be updated as the recipient's nursing care needs change. In addition, nursing notes describing the treatment and care provided must be completed by RNs and LPNs for private duty nursing care at the time of each visit.

31. In order to reimburse for private duty nursing services, DMAS requires a signed and dated physician order, a plan of care assessment, and documentation available for services rendered and billed, including daily nursing notes. Medicaid will not reimburse for services that are not so documented, and DMAS may recover any inappropriate payment.

32. In general, to obtain reimbursement for health care services, the provider must submit bills, or claims, to the patient's insurance carrier, referred to as a managed care organization (MCO). In some circumstances, the provider may submit claims directly to DMAS on behalf of a patient. Claims are sent electronically by wire and include the service

rendered and dates of service. After the claim has been processed and approved, payment for the service is sent to the provider.

## PROBABLE CAUSE

*Case initiation*

33. In 2021, the FBI and the Medicaid Fraud Control Unit (MFCU), as well as the Department of Health and Human Services, Office of Inspector General (HHS-OIG) initiated an investigation into alleged health care fraud committed by BRYANT-TAYLOR, SAMUEL, JOSEPHINE, and GORE doing business as 1ST ADULT.

34. This criminal investigation was initiated following a referral from the United States Attorney's Office (USAO) for the Western District of Virginia, Civil Division. As discussed further below, the USAO's Civil Division was investigating a *qui tam* complaint filed against 1ST ADULT. Information obtained through interviews of the two relators and a subsequent Civil Investigative Demand (CID) indicated 1ST ADULT was engaged in healthcare fraud and obstruction of justice related to the filing of false claims.

*1ST ADULT*

35. 1ST ADULT is enrolled with Medicaid as a home health agency providing private duty nursing, personal, and respite care. 1ST ADULT operates throughout the Commonwealth of Virginia, including in the Western District of Virginia. 1ST ADULT maintains a primary office in Fairfax, Virginia and, until recently, maintained a Lovingston, Virginia office as well.

36. BRYANT-TAYLOR is an owner and operator of 1st ADULT. BRYANT-TAYLOR is identified in documents filed with the Virginia State Corporation Commission (SCC) as both Director and President of 1ST ADULT. She is also identified by DMAS as the Chief

Operating Officer of 1ST ADULT. BRYANT-TAYLOR performs multiple roles for the organization, including overseeing office operations, staffing, marketing initiatives, and recruiting nurses and patients.

37. JOSEPHINE is an owner and operator of 1ST ADULT. JOSEPHINE is identified in documents filed with the SCC as Director, Vice President and Treasurer of 1ST ADULT. JOSEPHINE is responsible for, among other things, billing, payroll and office management.

38. SAMUEL is identified as an owner of 1ST ADULT & PEDIATRIC MEDICAL SUPPLY LLC on documents filed with DMAS. He is further identified in documents filed with the SCC as Secretary and an Officer of 1ST ADULT. SAMUEL assists with billing and staff and client management.

39. GORE is an owner and operator of 1ST ADULT. GORE is identified at various times in documents filed with the SCC as Secretary and Director of 1ST ADULT. GORE is a licensed RN and is 1ST ADULT's Director of Nursing. She is responsible for supervisory visits to patient homes and for updating patient plans of care.

*Enrollment in Medicaid*

40. On or about December 16, 2016, GORE, on behalf of 1ST ADULT, entered into Medicaid Participation Agreements under the name 1ST ADULT N PEDIATRIC HEALTHCARE SERVICE, in order to submit claims to Medicaid for providing private duty nursing, personal care and respite care services. GORE certified that she agreed, among other things, to comply with all state and federal laws and regulations as well as applicable policies and procedures of the Medicaid program.

41. On or about January 4, 2017, BRYANT-TAYLOR, on behalf of 1ST ADULT,

entered into Medicaid Participation Agreements under the name 1ST ADULT N PEDIATRIC HEALTHCARE, to submit claims to Medicaid for providing home health services and to allow 1ST ADULT to participate in and provide services in connection with Medicaid's Developmental Disability Waiver program. BRYANT-TAYLOR certified that she agreed, among other things, to comply with all state and federal laws and regulations as well as applicable policies and procedures of the Medicaid program.

42. On or about March 10, 2017, BRYANT-TAYLOR, on behalf of 1ST ADULT, entered into a Medicaid Participation Agreement under the name 1ST ADULT & PEDIATRIC MEDICAL SUPPLY LLC, in order to provide durable medical equipment and submit claims to Medicaid. BRYANT-TAYLOR certified that she agreed, among other things, to comply with all state and federal laws and regulations as well as applicable policies and procedures of the Medicaid program.

43. On or about July 3, 2019, BRYANT-TAYLOR, on behalf of 1ST ADULT, entered into Medicaid Participation Agreements under the name 1ST ADULT & PEDIATRIC HEALTHCARE SERVICES, in order to submit claims to Medicaid for respite care, private duty nursing, personal care and home health services. BRYANT-TAYLOR certified that she agreed, among other things, to comply with all state and federal laws and regulations as well as applicable policies and procedures of the Medicaid program.

*Civil investigation overview*

44. On September 30, 2019, Jessica Patterson filed a *qui tam* action under 31 U.S.C. § 3729 *et seq.* and Virginia Code § 8.01-216.1 *et seq.*, against 1ST ADULT, her former employer, alleging that 1ST ADULT billed Virginia Medicaid for home health services not actually

performed. *See United States ex rel. Jessica Patterson & Autumn Williams v. 1st Adult & Pediatrics Healthcare Services, Inc.,* Case No. 6:19cv00068 (W.D. Va.) (Moon, J.).

45. On November 5, 2019, Patterson, along with a second whistleblower, Autumn Williams, filed an Amended Complaint, alleging additional claims that 1ST ADULT billed Virginia Medicaid for home health care services that it did not provide, including billing for home health care when patients were hospitalized.

46. The United States, along with the Virginia Attorney General's Medicaid Fraud Control Unit, commenced a civil investigation into these allegations. Both governments ultimately intervened, alleging that 1ST ADULT billed Virginia Medicaid for home health care for 17 specific patients while those patients were hospitalized and could not have received such care.

47. On April 30, 2023, the parties executed a settlement agreement in which 1ST ADULT agreed to pay $3 million to the governments. 1ST ADULT paid $1 million in a lump sum and has made (and will continue to make) monthly payments of $41,750 in principal and $1,700 in interest until June 1, 2026.

*Criminal investigation overview*

48. Concerns that 1ST ADULT attempted to falsify nursing notes and obstruct justice surfaced in the course of the civil investigation and prompted a referral to criminal investigators. The ensuing criminal investigation has revealed that 1ST ADULT engaged in the following conduct:

a. Knowingly submitting and causing the submission of false claims to Medicaid, which fraudulently represented that patients had received services from 1st ADULT when no services were provided;

b. Knowingly submitting and causing the submission of false claims to Medicaid, which fraudulently represented that patients had received more hours or units of service from 1st ADULT than were actually provided;

c. Paying parents and guardians of patients to lie about services 1st ADULT was providing;

d. Paying parents and guardians of patients not to report information about 1st ADULT and its employees to investigators;

e. Telling parents and guardians of patients that they would lose Medicaid coverage if they switched home health agencies or told investigators about 1st ADULT's fraudulent practices;

f. Creating, attempting to create, and causing the creation of materially false records and other documents that were later used to support fraudulent claims submitted to Medicaid;

g. Directing parents and guardians of patients to sign blank nursing notes and patient records that were later used to support fraudulent claims submitted to Medicaid;

h. Failing to provide supervisory RN visits and update plans of care as required by Medicaid;

    i.   Moving 1st ADULT patients to another home health agency in furtherance of the scheme to defraud.

<u>Fraudulent billing</u>

49. Between January 1, 2017, and February 26, 2023, 1ST ADULT submitted approximately 87,619 distinct claims to Medicaid (either directly or through MCOs) pertaining to 255 beneficiaries for services allegedly rendered. Medicaid paid 1ST ADULT $38,304,602 for those submitted claims.

Patient 1

50. Patient 1 was authorized to receive private duty nursing care. BERTHE FEUZEU ("FEUZEU"), was the nurse assigned to PATIENT 1's care. FEUZEU never provided care to Patient 1. In lieu of providing care to PATIENT 1, PATIENT 1's guardian met FEUZEU every month at a specified location. During these meetings, FEUZEU presented PATIENT 1's guardian with blank nursing notes that would typically be used to document services provided by 1ST ADULT. PATIENT 1's guardian signed the blank notes and returned them to FEUZEU. In exchange for a signature on the blank nursing notes, FEUZEU paid PATIENT 1's guardian approximately $1,000 cash. These meetings were arranged by BRYANT-TAYLOR and FEUZEU. BRYANT-TAYLOR told PATIENT 1's guardian that PATIENT 1 would lose Medicaid coverage if PATIENT 1's guardian did not sign the blank nursing notes, accept payment, and lie about the services 1ST ADULT provided to PATIENT 1. From 2017 to 2023, 1ST ADULT submitted approximately 249 claims to Medicaid for approximately 15,304 hours of nursing services allegedly provided to PATIENT 1, resulting in a payout to 1ST ADULT of approximately $542,852. No nursing

services were ever provided to PATIENT 1 by 1ST ADULT.

Patient 2

51. PATIENT 2 was authorized to receive both personal care and nursing services and began using 1ST ADULT in 2020. ELIZABETH ILOME ("ILOME"), was assigned by 1ST ADULT to provide personal care to PATIENT 2. ENO UTUK ("UTUK"), was assigned by 1ST ADULT to provide nursing to PATIENT 2. PATIENT 2's parent advised that UTUK took PATIENT 2 to UTUK's personal home, which she shared with ILOME, on some weekends but, over time, the frequency of this arrangement diminished. No care was provided to PATIENT 2 in PATIENT 2's home. In lieu of care in PATIENT 2's home, UTUK and/or ILOME would provide PATIENT 2's parent with blank nursing notes to sign. In exchange, JOSEPHINE paid PATIENT 2's approximately $500 in cash or via Cash App[1] every two week. JOSEPHINE and BRYANT-TAYLOR told PATIENT 2's parent that PATIENT 2 would lose Medicaid coverage if PATIENT 2's parent did not sign the blank nursing notes, accept payment, and lie about the services 1ST ADULT provided to PATIENT 2. PATIENT 2's parent told investigators she was given a stack of blank nursing note forms to keep at her home on "stand by," to be signed as directed by JOSEPHINE, UTUK and/or ILOME. PATIENT 2's parent further told investigators that BRYANT-TAYLOR and JOSEPHINE pressured him/her to request authorization for more hours of care for PATIENT 2 from Anthem, PATIENT 2's insurance company. From 2020 to 2023, 1ST ADULT billed Medicaid for approximately 14,446 hours of nursing for PATIENT 2, resulting in a payout of approximately $335,773.

---

[1] These payments came from a third party's Cash App account with the memo reference "Eno."

## Patient 3

52. PATIENT 3 was authorized to receive private duty nursing care. JOSEPHINE and BRYANT-TAYLOR came to PATIENT 3's home in 2020 and offered to pay PATIENT 3's parent to be PATIENT 3's nurse. PATIENT 3's parent is not a nurse and has no medical training. JOSEPHINE and BRYANT-TAYLOR told PATIENT 3's parent that they knew he/she was financially unstable and needed money. Aside from a one-month period in the summer of 2021, 1ST ADULT never provided nursing services to PATIENT 3.

53. In lieu of providing care, BRYANT-TAYLOR and JOSEPHINE would send PATIENT 3's parent an envelope containing a stack of blank nursing notes. Inside the stack of nursing notes would be a smaller envelope of cash, which averaged approximately $1,000 per month. At some point, ANTHONY KANU ("KANU") was assigned as PATIENT 3's nurse. KANU provided no nursing care to PATIENT 3. In lieu of care, KANU would deliver blank nursing notes to PATIENT 3's parent for signature. In exchange, KANU paid PATIENT 3's parent in cash or via Cash App. BRYANT-TAYLOR and JOSEPHINE instructed PATIENT 3's parent to lie to investigators about the services 1st ADULT provided to PATIENT 3. From 2020 to 2023, 1ST ADULT billed Medicaid for approximately 39,219 units[2] of care resulting in a payout of approximately $351,010, when no services were rendered to PATIENT 3 outside of the one-month period in June, 2021.

---

[2] 1ST ADULT billed Medicaid under procedural code T1003 for PATIENT 3. This code reflects nursing services rendered by an LPN in 15-minute increments. Each 15-minute increment is one unit.

Patient 4

54. PATIENT 4 was authorized to receive private duty nursing care. From February, 2020 to August, 2023,[3] 1st ADULT provided no nursing care to PATIENT 4. In lieu of providing nursing care, JOSEPHINE paid PATIENT 4's parent approximately $500 every two weeks, purportedly to provide "personal care" to PATIENT 4. Billing records indicate 1ST ADULT never billed Medicaid for personal care services for PATIENT 4. Rather, between February, 2020 and January, 2023, 1ST ADULT billed Medicaid for 14,044 units[4] of nursing care for services not rendered, resulting in a payout of $468,162.

Patient 5

55. PATIENT 5 was authorized to receive 112 hours per week (16 hours per day) of nursing services, but PATIENT 5's guardian told investigators that PATIENT 5 never received the full 112 hours per week of nursing from 1st ADULT. In lieu of providing the full amount of nursing care, BRYANT-TAYLOR arranged to pay PATIENT 5's guardian approximately $600 every two to three weeks, which amount diminished over time, to provide care for PATIENT 5 when nursing was not available. BRYANT-TAYLOR told PATIENT 5's guardian that this arrangement was legal but to keep it between them. BRYANT-TAYLOR sent a nurse, later identified by investigators as RHABIATU KAMARA, to bring cash to PATIENT 5, along with blank nursing notes to be signed by PATIENT 5 in exchange for payment. From 2019 to 2022, 1ST ADULT billed Medicaid for

---

[3] PATIENT 4's parent told investigators that around the time he/she began to hear about an "audit," in August, 2023, 1st ADULT sent a nurse to care for PATIENT 4.

[4] For PATIENT 4, 1ST ADULT billed Medicaid under procedural codes T1002, for RN nursing services, and T1003, for LPN nursing services, both of which are provided in 15-minute increments. Each 15-minute increment is one unit.

approximately 19,913 units[5] of care for PATIENT 5, resulting in a payout of approximately $430,095.

Patient 6

56. Analysis of records pertaining PATIENT 6 obtained from the University of Virginia Hospital ("UVA") revealed that 1ST ADULT billed Medicaid for services allegedly provided during the following time periods when PATIENT 6 was hospitalized:

- July 24, 2018 to August 7, 2018

- September 3, 2018

- January 29, 2020 to February 9, 2020

57. Per billing records obtained from DMAS, 1ST ADULT billed Medicaid a total of $11,747 during the above periods in which PATIENT 6 was hospitalized at UVA, for services that were not rendered by 1ST ADULT:

---

[5] 1ST ADULT billed Medicaid a total of 13,639 hours under procedural codes S9123 and S9124 for PATIENT 5, from January, 2020 to June, 2022. For these procedural codes, each hour equals one unit. 1ST ADULT also billed a total of 6,274 units under procedural codes T1003 and T1002 for nursing services provided in 15-minute increments, from August, 2019 to June, 2022. For these procedural codes, each 15-minute increment is one unit.

| Date Begin Service Detail | Date End Service Detail | Billed Units | Paid Units | Total Billed | Total Paid |
|---|---|---|---|---|---|
| 7/23/2018 | 8/5/2018 | 168 | 168 | 5,371 | 4,430 |
| 9/3/2018 | 9/3/2018 | 84 | 84 | 2,685 | 2,215 |
| 1/27/2020 | 2/2/2020 | 84 | 84 | 3,098 | 2,551 |
| 2/3/2020 | 2/9/2020 | 84 | 84 | 3,098 | 2,551 |
| | | 420 | 420 | $14,252 | $11,747 |

58. PATIENT 6's parent confirmed that no services were rendered by 1ST ADULT during the periods specified above when PATIENT 6 was hospitalized. Additionally, a review of payroll records indicates 1ST ADULT did not report earnings or hours for the nurse assigned to provide care to PATIENT 6 during the periods specified above. Despite this, 1ST ADULT billed Medicaid for these time periods.

Patient 7

59. PATIENT 7's parent told investigators that PATIENT 7 had one nurse who provided approximately four to six hours of care to PATIENT 7 per week. PATIENT 7's parent advised there were times the nurse was late for her shift, left early, or did not show up to provide care to PATIENT 7.

60. PATIENT 7's parent maintained electronic notes identifying the days the nurse showed up to provide care to PATIENT 7, and when the nurse did not show up. According to PATIENT 7's parent's notes, which were provided to investigators, no services at all were

provided by 1ST ADULT to PATIENT 7 on the following dates:

     i. May 6, 2019 to May 12, 2019

     ii. June 17, 2019 to June 23, 2019

     iii. July 1, 2019 to July 7, 2019

     iv. July 8, 2019 to July 14, 2019

     v. July 15, 2019 to July 21, 2019

61. For these same periods, 1ST ADULT billed Medicaid 112 hours of nursing care per week for PATIENT 7:

| Date Begin Service Detail | Date End Service Detail | Billed Units | Paid Units | Total Billed | Total Paid |
|---|---|---|---|---|---|
| 5/6/2019 | 5/12/2019 | 112 | 112 | 3,401 | 3,401 |
| 6/17/2019 | 6/23/2019 | 112 | 112 | 4,131 | 4,131 |
| 7/1/2019 | 7/7/2019 | 112 | 112 | 4,131 | 4,131 |
| 7/8/2019 | 7/14/2019 | 112 | 112 | 4,131 | 4,131 |
| 7/15/2019 | 7/21/2019 | 112 | 112 | 4,131 | 4,131 |
| | | 560 | 560 | $19,924 | $17,007 |

Patient 8

62. PATIENT 8 never received nursing services from 1ST ADULT. From October, 2017, to February, 2021, 1ST ADULT billed Medicaid for approximately 15,400 hours of nursing for PATIENT 8, resulting in a payout of approximately $311,568, when no nursing

services were rendered to PATIENT 8.

## Patient 9

63. PATIENT 9 received nursing services from 1ST ADULT from January, 2020, through June, 2020. After this six-month period, all services from 1ST ADULT ceased.

64. From September, 2020, to January, 2021, 1ST ADULT billed Medicaid for approximately 448 units[6] of respite care and 544 hours of nursing for PATIENT 9, resulting in a payout of approximately $20,792, when no services whatsoever were rendered during this period.

## Patient 10

65. PATIENT 10 was authorized to receive 112 hours of nursing per week (16 hours per day) but only received between 42 to 66 hours of nursing per week from 1ST ADULT, according to PATIENT 10's parent. PATIENT 10's parent told investigators that PATIENT 10's plan of care had not been updated in over a year, despite a change both in PATIENT 10's health condition and prescribed medication. While working with a 1ST ADULT scheduler on PATIENT 10's upcoming nursing schedule, PATIENT 10's parent observed on the schedule for Wednesday, June 1, 2022, an entry for "485 Plan of Care – Shekita Gore, RN." PATIENT 10's parent told investigators that GORE never came to the home to assess PATIENT 10 in June, 2022, nor did the family have any contact whatsoever with GORE during that time.

66. From April, 2018 to October, 2018, 1ST ADULT billed Medicaid for approximately

---

[6] 1ST ADULT billed Medicaid under procedural code T1005 for PATIENT 9. This code reflects respite services provided in 15-minute increments. Each 15-minute increment is one unit. 1ST ADULT also separately billed Medicaid for nursing services allegedly provided to PATIENT 9.

1,428 hours of nursing care (procedural code S9124) for PATIENT 10, resulting in a payout of approximately $29,099. Concurrently, from August, 2018, to February, 2023, 1ST ADULT billed Medicaid for approximately 89,342 units[7] of care for PATIENT 10, resulting in a payout of approximately $518,878.

Patient 11

67. PATIENT 11's parent, who was also a former employee of 1ST ADULT,[8] told investigators that PATIENT 11 only ever received a maximum of 40 hours of nursing per week from 1ST ADULT despite being authorized to receive 56 hours of nursing care per week. A review of billing records indicates 1ST ADULT billed Medicaid for more hours of nursing services than actually rendered to PATIENT 11, and billed for periods of time in which PATIENT 11 received no nursing at all. PATIENT 11's parent told investigators that the first nurse provided by 1ST ADULT cared for PATIENT 11 for only two days in the spring of 2018. PATIENT 11 did not see another nurse for 4 to 6 months. PATIENT 11's second nurse provided approximately 40 hours per week of care according to PATIENT 11's parent. After the second nurse left, 1ST ADULT sent a third nurse 4 to 6 weeks later. The third nurse worked only three days, providing a total of 16 hours of care in October 2019.

68. From June 2018 to July 2018 billed Medicaid under procedural code T1003 for approximately 130 units[9] of nursing, resulting in a payout of approximately $3,428.

---

[7] 1ST ADULT billed Medicaid for PATIENT 10 under procedural code T1003, for LPN nursing services provided in 15-minute increments, for this period of time. Each 15-minute increment is one unit.
[8] PATIENT 11's parent was terminated from employment at 1ST ADULT after filing a complaint with PATIENT 11's insurance company related to 1ST ADULT's care of PATIENT 11.
[9] 1ST ADULT billed Medicaid for PATIENT 11 under procedural code T1003, for LPN nursing services provided in 15-minute increments, for this period of time. Each 15-minute increment is one unit.

Concurrently, from May, 2018 to April, 2019, 1ST ADULT billed Virginia Medicaid under procedural code S9124 for approximately 3,787 hours of nursing, resulting in a payout of $76,700.

## Falsification of Records

69. In addition to fraudulent billing and bribing parents and guardians of patients into signing blank nursing notes, as discussed above, 1ST ADULT took measures to obstruct justice by falsifying and attempting to falsify patient records and other documents.

70. In June, 2023, a former employee of 1ST ADULT told investigators that BRYANT-TAYLOR asked him/her to help fill out nursing notes because the notes were missing. BRYANT-TAYLOR provided the dates and times of the missing hours to this employee so he/she could fill out the nursing notes. BRYANT-TAYLOR then instructed this employee to mail the notes to each patient's parent or guardian for signature. This employee further told investigators that after he/she left employment with 1ST ADULT, he/she heard other employees claim the notes had gone missing due to a flood, but there was no flood during the period in which BRYANT-TAYLOR asked him/her to help fill out nursing notes.

71. Another 1ST ADULT employee, who worked in the Lovingston office, told investigators in June, 2023, that BRYANT-TAYLOR advised him/her of an audit.[10] BRYANT-TAYLOR told this employee that he/she needed to come to 1ST ADULT's main office in Fairfax to assist. This employee told investigators that he/she observed nurses coming into the Fairfax office and signing notes that had been rewritten.

---

[10] The investigation has revealed that BRYANT-TAYLOR and others at 1ST ADULT used the term "audit" universally to refer to any investigation. Regardless of which investigation prompted the need to find missing nursing notes, 1ST ADULT's response appears to have been similar across the board.

72. Parent of PATIENT 12, who was also a former employee of 1ST ADULT, told investigators that BRYANT-TAYLOR reached out to him/her in March, 2021,[11] more than a year after his/her employment ended and PATIENT 12 had stopped receiving services from 1ST ADULT. BRYANT-TAYLOR told PATIENT 12's parent that 1ST ADULT was being audited and that BRYANT-TAYLOR had some paperwork she needed him/her to complete regarding PATIENT 12's care. In a recorded call on March 9, 2021, BRYANT-TAYLOR told PATIENT 12's parent that they "don't have some notes" related to PATIENT 12's case, and she "just wants to be sure [PATIENT 12's parent] know[s] we were there taking care of [PATIENT 12.]"

73. Parent of PATIENT 13 told investigators that BRYANT-TAYLOR also contacted him/her in February, 2021, more than a year after PATIENT 13 stopped receiving services from 1ST ADULT, regarding paperwork he/she needed to fill out related to an "audit." Specifically, BRYANT-TAYLOR told PATIENT 13's parent that he/she needed to "update information" and "fix some problems" with paperwork. BRYANT-TAYLOR showed up at PATIENT 13's former residence and knocked on the door. BRYANT-TAYLOR contacted PATIENT 13's parent numerous times until PATIENT 13's parent blocked her number. PATIENT 13's parent told investigators that he/she suspected BRYANT-TAYLOR was attempting to falsify documents related to PATIENT 13's care.

74. Additionally, witnesses have told investigators that GORE has backdated plans of care in order to appear in compliance with Medicaid guidelines. GORE told one confidential source that GORE would backdate a patient's plan of care so it looked like GORE, an RN,

---

[11] The CID was issued in February, 2021, in connection with the federal civil investigation.

had conducted a supervisory visit and updated a patient's plan of care within the period required by DMAS, even though GORE had not done so.

75. Other witnesses corroborated this source's statement to investigators. Witnesses repeatedly told investigators that 1ST ADULT did not update plans of care as required by Medicaid. For example, one 1ST ADULT nurse told investigators that his/her patient's plan of care had not been updated monthly by GORE as required. This nurse advised that calendar entries in 1ST ADULT's EHR scheduling system erroneously indicated that GORE had been to the patient's home, when no such visit had been made.

76. Another 1ST ADULT nurse interviewed by investigators in 2022 advised that no supervisory RN had been out to see his/her patient in approximately two years. This nurse further advised that the patient's plan of care had not been updated as required, despite a change in the patient's health.

77. At least one caregiver told investigators he/she had been directed to alter notes related to patient care that would be used to justify claims to DMAS for services rendered. Specifically, BRYANT-TAYLOR directed this caregiver to "re-do" notes pertaining to personal care he/she provided to PATIENT 10. This caregiver advised he/she had documented all the details of PATIENT 10's day, including whether or not PATIENT 10 had a seizure or other complication, on the initial version of the notes submitted to 1ST ADULT. BRYANT-TAYLOR asked this caregiver to "redo" nursing notes previously submitted for the time period of January, 2019 to January, 2020. BRYANT-TAYLOR directed this caregiver to write, simply: "Completed activities of daily living (ADLs) [PATIENT 10] had a nice bath," rather than provide a detailed account of the day.

78. In addition to the monetary incentives discussed above, BRYANT-TAYLOR and JOSEPHINE have bribed patients' parents and guardians with non-monetary incentives to lie about services rendered. For example, BRYANT-TAYLOR went to the home of PATIENT 6 in 2021. PATIENT 6's parent had not met BRYANT-TAYLOR previously. BRYANT-TAYLOR told PATIENT 6's parent that BRYANT-TAYLOR was in trouble with some paperwork related to 1ST ADULT billing, specifically regarding the number of hours of care PATIENT 6 was authorized to receive and the number of hours PATIENT 6 actually received. BRYANT-TAYLOR instructed PATIENT 6's parent to tell investigators that PATIENT 6 received all authorized hours of care that 1ST ADULT had billed for, even if services were not rendered. In exchange, BRYANT-TAYLOR offered PATIENT 6's parent diapers, a hotel, or a vacation away. BRYANT-TAYLOR told PATIENT 6's parent that she was a grandma and could not go to prison.

79. The statements by PATIENT 6's parent were corroborated by a UVA nurse, who had become close friends with PATIENT 6's family as a result of PATIENT 6's extended stay in the UVA neonatal intensive care unit. This nurse told investigators that PATIENT 6's parent had related that BRYANT-TAYLOR came to see him/her because 1ST ADULT had billed Medicaid for more hours of care than they actually provided, and that BRYANT-TAYLOR offered diapers and hotel room stays to "keep quiet" about these billing errors.

80. Multiple witnesses told investigators that SAMUEL paid PATIENT 14's parent $8,000 to keep quiet about incidents involving 1ST ADULT nurses assigned to care for PATIENT 14. One nurse had allegedly broken into PATIENT 14's home and stolen drugs

and a flat screen television. BRYANT-TAYLOR told PATIENT 14's parent that she would replace everything. BRYANT-TAYLOR refused to provide any information about the nurse, and the nurse's information was wiped from 1ST ADULT's system. In a separate incident, a second nurse, a heavy drug user, assigned to provide care to PATIENT 14 was found passed out in PATIENT 14's home during a home health visit by another agency. BRYANT-TAYLOR refused to allow 1ST ADULT employees to report these incidents to the Board of Nursing or to take over management of PATIENT 14's case. One witness told investigators that SAMUEL asked him/her to draft a nondisclosure agreement to accompany the $8,000 payment to PATIENT 14's parent.

81. BRYANT-TAYLOR and JOSEPHINE paid one parent of 1st ADULT patients ("PARENT A") a total of approximately $1500 to $2000 and used sensitive, personal information about PARENT A that was known to BRYANT-TAYLOR, to coerce PARENT A into signing blank nursing notes and lie to investigators about services provided by 1ST ADULT. At some point, PARENT A told BRYANT-TAYLOR that his/her children no longer needed services from 1ST ADULT, but BRYANT-TAYLOR insisted that PARENT A's children continue to receive services so that 1ST ADULT could continue to bill Medicaid.

## Creation of American Pediatric

82. In or about 2021, BRYANT-TAYLOR and GORE began actively operating American Pediatric & Adult Healthcare Service ("American Pediatric"), another home health agency, which investigators believe to was in response to the investigation into 1ST ADULT's fraudulent billing practices. BRYANT-TAYLOR and GORE began moving 1ST

ADULT patients to American Pediatric in order to further and continue the scheme to defraud Medicaid.

83. In order to conceal BRYANT-TAYLOR's affiliation with American Pediatric, BRYANT-TAYLOR submitted documents to the SCC listing third parties as owners and operators of American Pediatric and using third party mailing addresses as the registered address of the company without permission.

## CONCLUSION

84. Based on the forgoing, I request that the Court issue the proposed search warrant.

85. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Axxess. Because the warrant will be served on Axxess, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Megan Effing
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on ___November 28, 2023___, 2023.

_____

Honorable C. Kailani Memmer
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with Axxess account associated with

1ST ADULT N PEDIATRIC HEALTHCARE, National Provider Identifier (NPI)

1912356098; 1ST ADULT & PEDIATRIC HCS, INC., NPI 1992367841; 1ST ADULT &

PEDIATRIC MEDICAL SUPPLY LLC, NPI: 1770025124 (collectively, "1ST ADULT"),

(the "Subject Account"), that is stored at premises owned, maintained, controlled, or

operated by Axxess, a cloud-based electronic health records located at 16000 Dallas

Parkway, Suite 700N, Dallas, Texas.

**ATTACHMENT B**

Particular Things to be Seized

I.   Information to be disclosed by AXXESS (the Provider)

To the extent that the information described in Attachment A is within the possession, custody, or control of Axxess, including electronic health records, files, schedules, logs, billing documentation, or information that has been deleted but is still available to Axxess, regardless of whether such information is located within or outside of the United States, Axxess is required to disclose to the government for the Subject Account listed in Attachment A the following information:

A.  The complete electronic health record for all individuals listed in the below table, including information on authorship associated with the record, and the date and time at which each record was created and edited:

| Patient number | Patient name | Date of birth | Medicaid ID |
| --- | --- | --- | --- |
| Patient 1 | | 17 | |
| Patient 2 | | 17 | |
| Patient 3 | | 04 | |
| Patient 4 | | 17 | |
| Patient 5 | | 58 | |
| Patient 6 | | 17 | |
| Patient 7 | | 18 | |
| Patient 8 | | 15 | |
| Patient 9 | | 15 | |
| Patient 10 | | 03 | |
| Patient 11 | | 08 | |
| Patient 12 | | 17 | |
| Patient 13 | | 17 | |
| Patient 14 | | 97 | |
| Parent A's children | | 08 | |
| | | 08 | |
| | | 08 | |

B. All records pertaining to the electronic scheduling of the individuals listed above, to include such information as services provided by 1ST ADULT, access logs identifying who created the schedules, geolocation data, audit logs associated with any edits or alterations to the schedules, and any other information/documentation pertaining to the creation and/or editing of the schedules.

C. All claims and billing data related to the individuals listed above, including: electronic transmission of patient billing, claims, charges, payments, all claim images and attachments stored in Provider's system.

D. Any other records for the individuals listed above.

E. All records and other information regarding the identification of the Axxess account, to include the owner's full name, physical address, telephone numbers and other identifiers, records of login times and durations, the date on which the account was created, the IP address used to register the account, log-in IP addresses associated with session times and dates, geolocation data, current account status, alternative email address and contact information provided during the registration of the account, means and sources of payment for the account (including any credit or bank account information), any supporting documents provided by the owner to open the account and any background information on the owner generated by Axxess to support opening the account.

F. Any and all communications between Provider and 1ST ADULT N PEDIATRIC HEALTHCARE, National Provider Identifier (NPI) 1912356098; 1ST ADULT & PEDIATRIC HCS, INC., NPI 1992367841; 1ST ADULT & PEDIATRIC

MEDICAL SUPPLY LLC, NPI: 1770025124, and any of their owners, operators or affiliated entities, concerning technical problems, billing or other inquiries, and/or complaints including, but not limited to of records contacts with the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and/or instrumentalities of violations of 18 U.S.C. § 1347 (Health Care Fraud), 18 U.S.C. § 1349 (Conspiracy to Commit Health Care Fraud), and 18 U.S.C. § 1512 (Obstruction of Justice), those violations involving CAROLYN BRYANT-TAYLOR ("BRYANT-TAYLOR"), SAMUEL OKOCHA ("SAMUEL"), KAFOMIDI "JOSEPHINE" OKOCHA ("JOSEPHINE"), and SHEKITA GORE ("GORE") a/k/a SHEKITA STEELE, doing business as 1ST ADULT N PEDIATRIC HEALTHCARE, National Provider Identifier (NPI) 1912356098; 1ST ADULT & PEDIATRIC HCS, INC., NPI 1992367841; 1ST ADULT & PEDIATRIC MEDICAL SUPPLY LLC, NPI: 1770025124 (collectively, "1ST ADULT"), and occurring after January 1, 2016, including, for the Subject Account listed on Attachment A, information pertaining to the following matters:

A. Electronic health records of the individuals listed in Part I.a.

B. Billing and claims data submitted on behalf the individuals listed in Part I.a.

C. Scheduling records of the individuals listed in Part I.a.

D. Account and subscriber information.

E. Correspondence or communications between 1ST ADULT and the Provider.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the

laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information

contained in this certification is true and correct. I am employed by Axxess, and my title is

_____. I am qualified to authenticate the records attached

hereto because I am familiar with how the records were created, managed, stored, and

retrieved. I state that the records attached hereto are true duplicates of the original records

in the custody of Axxess. The attached records consist of _____

**[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state

that:

    a.    all records attached to this certificate were made at or near the time of the

occurrence of the matter set forth by, or from information transmitted by, a person with

knowledge of those matters, they were kept in the ordinary course of the regularly conducted

business activity of Axxess, and they were made by Axxess as a regular practice; and

    b.    such records were generated by Axxess's electronic process or system that

produces an accurate result, to wit:

        1.    the records were copied from electronic device(s), storage medium(s),

or file(s) in the custody of Axxess in a manner to ensure that they are true duplicates of the

original records; and

2. the process or system is regularly verified by Axxess, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____      _____
Date                     Signature